The STATE ex rel. LUCAS COUNTY BOARD OF MENTAL RETARDATION
AND DEVELOPMENTAL DISABILITIES

v.

PUBLIC EMPLOYEES RETIREMENT BOARD et al.

[Cite as *State ex rel. Lucas Cty. Bd. of Mental Retardation & Dev. Disabilities
v. Pub. Emps. Retirement Bd.*, 179 Ohio App.3d 439, 2008-Ohio-5754.]

Court of Appeals of Ohio,
Tenth District, Franklin County.

No. 07AP–582.

Decided Nov. 6, 2008.

440

Julia R. Bates, Prosecuting Attorney, Andrew K. Ranazzi and John A. Borell Sr., for relator.

Sheryl Creed Maxfield, First Assistant Attorney General, and Laura Erbia Parsons, Assistant Attorney General, for respondent Public Employees Retirement Board.

Vorys, Sater, Seymour & Pease, L.L.P., Michael J. Settineri and Megan A. Robinson, for respondents Anita Allen and Monica Schmidt Armstrong.

Walter J. Gerhardstein Jr., for respondent Mary C. Dunn–Brock.

_____

BRYANT, Judge.

{¶ 1} Relator Lucas County Board of Mental Retardation and Developmental Disabilities commenced this original action requesting a writ of mandamus that orders respondent Ohio Public Employees Retirement Board to vacate its decision that respondents Anita Allen, Monica Schmidt Armstrong, and Mary C. Dunn–Brock ("claimants") were carry-over public employees under R.C. 145.01(A)(2) while employed with Community Living Options, Inc. ("CLO"), a nonprofit corporation, and to enter a decision that claimants were not carry-over employees while employed with CLO.

{¶ 2} Pursuant to Civ.R. 53 and Loc.R. 12(M) of the Tenth Appellate District, this matter was referred to a magistrate who issued a decision, including findings of fact and conclusions of law, attached as Appendix A. In his decision, the magistrate concluded that "the hearing examiner appropriately analyzed the conflicting evidence before him." Magistrate's Decision, ¶ 57. Accordingly, the magistrate determined that "the report and recommendation of the hearing examiner adopted by [the Ohio Public Employees Retirement Board] sets forth sufficient evidence from the record supporting the board's determination that claimants continued to perform the same or similar duties under the direction of CLO." Magistrate's Decision, ¶ 50. The magistrate thus concluded that the requested writ should be denied.

{¶ 3} Relator filed objections to the magistrate's decision:

1. The Magistrate applies a "core function similarity test" to the comparison of the jobs that the Respondents held, both during their tenure with the Relator and the CLO. The "core function similarity test" is not supported by any reasonable interpretation of RC 145.01(A)(2) or any case law's reasonable interpretation of RC 145.01(A)(2).

2. The Magistrate erroneously interpreted the testimony of Fred DeCrescentis and Lori Stanfa as indicating that the positions filled by the Relators for the Lucas County MRDD and the positions they performed for the CLO were, while overlapping, so similar to the point of requiring PERS benefits to be paid on behalf of the Relators while they were performing their functions at CLO.

3. The Magistrate fails to consider the fact that the jobs resigned from (voluntarily) by the Respondents were NOT outsourced, eliminated or reassigned.

4. Finding of fact number 6 contains incorrect assertions that are totally devoid of support in the record.

{¶ 4} In its first objection, relator contends that the magistrate erred in applying a "core-function similarity test" to determine whether the evidence supported the hearing examiner's conclusion that claimants performed same or similar activities acting as case managers for relator and quality-assurance personnel with CLO. According to relator, any reasonable interpretation of R.C. 145.01(A)(2) or case law interpreting it does not support application of a "core function similarity test."

{¶ 5} R.C. 145.01(A)(2) provides that a carry-over public employee is "[a] person who is a member of the public employees retirement system and who continues to perform the same or similar duties under the direction of a contractor who has contracted to take over what before the date of the contract was a publically operated function." Because examining the "function" inherent in claimants' duties with relator and with CLO necessarily indicates to what extent the jobs were similar, the magistrate did not err in applying a core-function similarity test. To the contrary, in light of the difficulty in administering the "same or similar" language from R.C. 145.01(A)(2), the magistrate reasonably attempted to articulate the nature of the standard by exploring what function claimants performed in their positions with relator and with CLO. Relator's first objection is overruled.

{¶ 6} Relator's second objection contends that the magistrate erred in interpreting the testimony of Fred DeCrescentis and Lori Stanfa to indicate that claimants' positions with relator and with CLO were similar under R.C. 145.01(A)(2).

{¶ 7} Both individuals testified to a degree of similarity in the job duties claimants performed in their employment with relator and with CLO. Relator does not contend that the witnesses did not so testify. Instead, relator appears to suggest that their testimony is insufficient to warrant a finding that claimants' job duties with relator as case managers are similar to their duties as quality-assurance personnel with CLO. The hearing examiner, however, did not rely solely on the testimony of those two individuals to reach his conclusion. Instead, he considered also the testimony of Anita Allen, weighed the credibility of the witnesses, and determined that the evidence supported a finding that claimants' duties with relator were similar to their duties with CLO. Relator's second objection is overruled.

{¶ 8} Relator's third objection contends that the magistrate erred in failing to consider that the claimants' positions with relator from which they voluntarily resigned were not outsourced, eliminated, or reassigned. To the

extent relator contends that R.C. 145.01(A)(2) does not apply to individuals who voluntarily resign their positions to take a position with a nonprofit entity, relator fails to present authority to support the contention. Indeed, nothing in the language of R.C. 145.01(A) so suggests. See *Greene Co. Dept. of Job & Family Servs. v. Ohio Pub. Emp Retirement Sys.*, Franklin App. No. 07AP–421, 2008-Ohio-642, 2008 WL 435008, at ¶ 18, 29 (concluding that Stiles's resignation from her employment with the county "solely for the purpose of immediately continuing the same duties" with the newly established nonprofit entity did not preclude her being a carry-over employee for purposes of PERS benefits).

{¶ 9} Moreover, to the extent relator contends that the Supreme Court of Ohio concluded in *State ex rel. Mallory v. Pub. Emp. Retirement Bd.* (1998), 82 Ohio St.3d 235, 694 N.E.2d 1356, that only claimants who voluntarily resign may receive benefits, its argument is unpersuasive. As the respondent board notes, relator does not point to any specific portion of the *Mallory* decision supporting its assertions, and we find none that requires either that the claimant's resignation be involuntary or that the position held with the former employer be outsourced, eliminated, or reassigned. Indeed, nothing in the language of R.C. 145.01(A)(2) suggests that any of those factors is critical in determining whether the jobs claimants performed for relator are similar to those performed for CLO. Relator's third objection is overruled.

{¶ 10} Finally, relator's fourth objection asserts that the magistrate's finding of fact No. 6 is incorrect in stating that "relator created CLO, a nonprofit entity, solely for the purpose of transferring supported living services to CLO." Relator asserts that it "at no time provided 'supported living services' so it could never have transferred them to the CLO."

{¶ 11} Contrary to relator's contentions, the record supports the magistrate's finding. Relator's board meeting minutes of October 31, 1989 indicate that relator accepted an appropriation for supported-living services with the specific purpose of planning, developing, and implementing supported-living services. Indeed, the same meeting minutes indicate that by so voting, the board intended to assume all incumbent responsibilities in accordance with R.C. 5126.40 to 5126.47 for the coordination and management of supported-living services.

{¶ 12} In the interim before CLO began providing services, relator's case managers provided supported-living services. Lori Stanfa, who served as CLO's first executive director, testified that relator's case managers "were assigned to assist us [at the CLO] in developing plans for the supported living clients, initially. They did that for some period of time until we took over that function later. * * * [T]here was some overlap for a period. But when [sic] we ended up taking all those functions over completely." Because the record supports the magistrate's finding that relator, through its case managers, was providing

supported-living services for a short period of time, we overrule the fourth objection.

{¶ 13} Following independent review pursuant to Civ.R. 53, we find that the magistrate has properly determined the pertinent facts and applied the salient law to them. Accordingly, we adopt the magistrate's decision as our own, including the findings of fact and conclusions of law contained in it. In accordance with the magistrate's decision, we deny the requested writ of mandamus.

Objections overruled;
writ denied.

McGRATH, P.J., and TYACK, J., concur.

APPENDIX A

MAGISTRATE'S DECISION

Rendered on June 27, 2008

IN MANDAMUS

MACKE, Magistrate.

{¶ 14} In this original action, relator, Lucas County Board of Mental Retardation and Developmental Disabilities ("relator" or "Lucas County MRDD"), requests a writ of mandamus ordering respondent Ohio Public Employees Retirement Board ("OPERB" or "board") to vacate its decision that respondents Anita Allen, Monica Schmidt Armstrong, and Mary C. Dunn–Brock ("claimants") were carry-over public employees under R.C. 145.01(A)(2) while employed with Community Living Options, Inc. ("CLO"), a nonprofit corporation, and to enter a decision that claimants were not carry-over public employees while employed with CLO.

*Findings of Fact:*

{¶ 15} 1. The Ohio Public Employees Retirement System ("OPERS") is a public retirement system created by Chapter 145 of the Ohio Revised Code for the public employees of the state of Ohio and its political subdivisions. R.C. 145.03(A). Membership in the system is compulsory upon being employed and shall continue as long as public employment continues. Id.

{¶ 16} 2. Claimants were all initially employed with Lucas County MRDD as case managers and were contributing members of OPERS for this service.

{¶ 17} 3. In 1989, the Ohio General Assembly enacted Am.Sub.H.B. No. 257, which authorized county boards of mental retardation and developmental disabilities to provide or contract for supported-living services.

{¶ 18} 4. On October 31, 1989, relator passed a resolution accepting a state appropriation for supporting-living services.

{¶ 19} 5. While relator prepared to establish a nonprofit entity, it began providing supported-living services to individuals with mental retardation and developmental disabilities in Lucas County.

{¶ 20} 6. Thereafter, relator created CLO, a nonprofit entity, solely for the purpose of transferring supported-living services to CLO. CLO was incorporated as a nonprofit entity with the Ohio Secretary of State on December 6, 1990.

{¶ 21} 7. Claimants resigned their positions with relator and immediately began employment with CLO as either a quality-assurance coordinator or quality-assurance specialist.

{¶ 22} 8. Each of the claimants terminated employment with CLO prior to December 23, 2002, the date CLO was formally dissolved.

{¶ 23} 9. OPERS initially received a request from Kelly Allred, a former CLO employee, inquiring as to whether she was eligible for OPERS membership for her service with CLO.

{¶ 24} 10. OPERS's investigation of Allred's request disclosed several individuals who were similarly situated. Claimants were among those individuals. Relator had not remitted contributions to OPERS for claimants' service with CLO.

{¶ 25} 11. On October 18, 2004, an OPERS compliance officer issued a staff determination that claimants were carry-over public employees during their service with CLO. Relator administratively appealed this staff determination.

{¶ 26} 12. On December 1, 2004, OPERS's benefit resolution officer, Cheryl Thompson, upheld the staff determination that claimants were carry-over public employees while employed with CLO. Relator administratively appealed this second staff determination.

{¶ 27} 13. On May 8, 2005, OPERS's general counsel, Julie Emch Becker, issued a senior staff determination finding that claimants were carry-over public employees while employed with CLO. The senior staff determination states:

> According to the information we received, CLO was a non-profit organization created by the Lucas County Board of MR/DD (Board) to administer supported living, a program designed to benefit individuals with mental retardation/developmental disabilities. As such, CLO was not a public employer as defined in R.C. 145.01(D), but was a non-profit entity created to administer specialized services on behalf of the Board.
>
> Anita Allen, Monica Armstrong (Schmidt) and Mary Dunn–Brock resigned from the Board and immediately began their employment with CLO. A review

of the position descriptions submitted for Quality Assistance Coordinator, Quality Assurance Specialist (CLO positions) and Case Manager (Board position) indicates that while there are some differences in job duties, they are materially similar in nature.

{¶ 28} 14. Relator administratively appealed the senior staff determination.

{¶ 29} 15. Pursuant to Ohio Adm.Code 145–1–11, OPERS referred the appeal to a hearing examiner.

{¶ 30} 16. On September 16, 2006, the hearing examiner conducted an evidentiary hearing.

{¶ 31} 17. Three witnesses testified at the September 16, 2006 hearing. Respondent Allen testified on behalf of claimants. Fred DeCrescentis, former superintendent of Lucas County MRDD, and Lori Stanfa, former executive director of CLO, testified on behalf of relator.

{¶ 32} 18. On December 4, 2006, the hearing examiner issued his report and recommendation to OPERB. In his 24–page report and recommendation, the hearing examiner found:

* * * I find that after ending their employment for Lucas County, the Claimants continued to perform the same or similar duties under CLO's direction. Accordingly, I find the Claimants have met their burden of establishing their eligibility for PERS membership during their service with the non-profit corporation. * * *

{¶ 33} 19. Relator objected to the report and recommendation of the hearing examiner.

{¶ 34} 20. At its February 21, 2007 meeting, OPERB considered the matter and the parties were permitted to address the board.

{¶ 35} 21. OPERB voted to accept the findings of fact and conclusions of law contained in the December 4, 2006 report and recommendation of the hearing examiner. The parties were duly notified of the board's decision.

{¶ 36} 22. On July 20, 2007, relator filed this mandamus action.

*Conclusions of Law:*

{¶ 37} It is the magistrate's decision that this court deny relator's request for a writ of mandamus, as more fully explained below.

{¶ 38} This action involves the board's application of R.C. 145.01(A)(2), which defines a so-called carry-over public employee as:

A person who is a member of the public employees retirement system and who continues to perform the same or similar duties under the direction of a contractor who has contracted to take over what before the date of the contract

was a publicly operated function. The governmental unit with which the contract has been made shall be deemed the employer for the purposes of administering this chapter.

{¶ 39} In *State ex rel. Van Dyke v. Pub. Emp. Retirement Bd.*, 99 Ohio St.3d 430, 2003-Ohio-4123, 793 N.E.2d 438, the court held that Van Dyke was not an R.C. 145.01(A)(2) carry-over public employee.

{¶ 40} In December 1984, the Franklin County Public Defender's Office ("FCPDO") was incorporated as a nonprofit corporation. The newly incorporated FCPDO then contracted to provide legal representation for indigent criminal defendants in Franklin County.

{¶ 41} Earlier, in November 1983, upon admission to the Ohio bar, Van Dyke became a staff attorney for FCPDO. In that position, her duties included representing indigent persons charged with felonies or serious misdemeanors and representing indigent persons in civil commitment proceedings.

{¶ 42} In November 1985, Van Dyke resigned her position with FCPDO and began working as a staff attorney in the Bureau of Support of the Franklin County Court of Common Pleas, Division of Domestic Relations. Van Dyke's duties at the bureau of support included enforcing support orders by civil contempt and other civil proceedings.

{¶ 43} In March 1986, Van Dyke resigned her position with the bureau of support. In her letter of resignation, Van Dyke specified that she missed the work that her job with the bureau of support did not provide.

{¶ 44} In April 1986, FCPDO rehired Van Dyke as a staff attorney, and she remained at that job until she resigned in August 1991 and was appointed to her current position as a magistrate for the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch.

{¶ 45} In July 2001, Van Dyke filed a complaint in this court for a writ of mandamus ordering OPERB to grant her OPERS membership status and service credit for her FCPDO employment from April 1986 to August 1991. In September 2002, this court granted the writ, and OPERB appealed as of right to the Supreme Court of Ohio.

{¶ 46} The *Van Dyke* court held that OPERB did not abuse its discretion by concluding that Van Dyke was not a public employee under R.C. 145.01(A)(2)'s carry-over provision.

{¶ 47} Among the reasons the *Van Dyke* court provided:

* * * Van Dyke did not perform the "same or similar duties" under FCPDO's direction as she had for her immediately preceding job with the bureau of support. "Words used in a statute must be taken in their usual, normal or

customary meaning." *State ex rel. Richard v. Bd. of Trustees of Police & Firemen's Disability & Pension Fund* (1994), 69 Ohio St.3d 409, 412 [632 N.E.2d 1292] * * *; R.C. 1.42. "Same" means "resembling in every way" and "identical," and "similar" means "very much alike," "comparable," and "alike in substance or essentials." Webster's Third New International Dictionary (1986) 2007 and 2120. Van Dyke's duties for FCPDO were primarily to represent indigent criminal defendants, whereas her duties for the bureau were to enforce child-support orders through civil means. These duties are neither the same nor similar. Van Dyke herself conceded this in her letter resigning from her position with the bureau of support after her first term of employment with FCPDO. In the letter, she stated that she "miss[ed] terribly the trial work and the one to one representation of clients" that her job with FCPDO had provided.

Id. at ¶ 31.

{¶ 48} Here, relator contends that the evidence showed that claimants did not continue "to perform the same or similar duties under the direction of a contractor," which is CLO. R.C. 145.01(A)(2). On the other hand, OPERB argues that it relied upon some evidence, if not considerable evidence, supporting its determination that claimants met the statutory requirement that they continued to perform the same or similar duties under the direction of CLO.

{¶ 49} In *State ex rel. Schaengold v. Ohio Pub. Emps. Retirement Sys.*, 114 Ohio St.3d 147, 2007-Ohio-3760, 870 N.E.2d 719, at ¶ 20, the court apparently applied the "some evidence" standard in finding "[t]here is sufficient evidence here to support the board's determination that Schaengold was an independent contractor rather than a public employee when he served as a temporary magistrate for the Dayton Municipal Court."

{¶ 50} Here, the report and recommendation of the hearing examiner adopted by OPERB set forth sufficient evidence from the record supporting the board's determination that claimants continued to perform the same or similar duties under the direction of CLO. Much of that evidence was provided by the testimony of Anita Allen which the hearing examiner summarized in great detail in his report and recommendation.

{¶ 51} Anita Allen and Monica Schmidt Armstrong were employed by CLO as quality-assurance coordinators. Mary C. Dunn–Brock was employed by CLO as a quality-assurance specialist.

{¶ 52} During direct examination, Allen was asked to identify the case-manager job description applicable to all three claimants during their service with relator. Allen was then asked a series of questions designed to compare the case manager job description with the CLO positions of quality-assurance coordinator and

quality-assurance specialist. That is, specific job duties and responsibilities enumerated on the case-manager job description were compared to specific job duties and responsibilities enumerated on the quality-assurance positions.

{¶ 53} During her cross-examination, relator's counsel elicited that Allen was employed as a habilitation coordinator for relator for one year prior to taking employment with CLO as a quality-assurance coordinator. Allen was employed as a case manager prior to her employment as a habilitation coordinator for relator.

{¶ 54} In his report and recommendation, the hearing examiner succinctly summarizes the testimony of Allen regarding the positions held:

> Ms. Allen then identified the position description for the position she held as an employee of CLO, and said she and Ms. Dunn–Brock and Ms. Armstrong (Schmidt) all had the same responsibilities at CLO. She then compared her duties at Lucas County to the duties she performed at CLO, and said "there was a lot of similarities in the responsibilities." The first duty, she said, was that as a case manager, she was responsible to "ensure the involvement of multiple agencies regarding the timely and type of service." She said those were the same duties she had at CLO, where it calls for "facilitating the annual review process at supportive living and ensure compliance with QA standards and administrative rules." She said the requirement at Lucas County where she "links eligible individuals with service providers," was the same as the CLO duty that required her to "assist as necessary with placement of eligible individuals." She said in both jobs she had to assume responsibility for development of ISPs, and in both jobs she needed to investigate and report major unusual incidents involving allegations of abuse or neglect. She said in both jobs she needed to participate in the development and expansion of community resources, and monitor residential placements in facilities licensed by the State. She said in both jobs, she needed to interact with a variety of individuals and agencies both internally and externally, and in both jobs she needed to implement and maintain the records, reports and correspondence associated with these services.

> On cross-examination, Ms. Allen agreed that the work she did at Lucas County was all in the context of "the group home dynamic," whereas at CLO "what we were doing * * * was taking people who didn't have residential placements and getting them into residential placements."

> Although it does not appear to be the case for Ms. Dunn–Brock and Ms. Armstrong (Schmidt) (both of whom appear to have been case managers for Lucas County at the time their positions were eliminated and they began working for CLO), Ms. Allen was not a case manager when she accepted a position at CLO. She was, instead, a habilitation coordinator for Lucas County,

where she oversaw the staff at the Lott Industries workshop. "I made sure that the ISPs and the work plans that people had were facilitated. I worked with the case management department. I worked with the residential providers to make sure that people's plans were being implemented." Thus, while Ms. Allen was working for Lucas County at the time she accepted a position at CLO, she was not a case manager: she was a habilitation coordinator, a position she had held for a year, when she resigned from Lucas County to work at CLO. The habilitation coordinator had a different set of duties, emphasizing habilitation (i.e., skills that are needed to be fit or capable in society, including work skills). As was the case when she was a case manager, Ms. Allen said as a habilitation coordinator she was responsible to monitor and assess the needs of MRDD clients, just like case managers did, but as a habilitation coordinator she also supervised case managers. From the record now before the Board, there was insufficient evidence (including the position description shown as Petitioner's Exhibit No. 33) to effectively contradict Ms. Allen's testimony on this point: the only witness besides Ms. Allen who described the work of a habilitation coordinator had only superficial knowledge about the work, stating only that "I'm familiar with it, the title anyway," and adding that she had never worked as a habilitation specialist nor had she supervised any habilitation specialists.

{¶ 55} As earlier noted, Fred DeCrescentis, former superintendent of Lucas County MRDD, was called to testify on behalf of relator before the hearing examiner. In his report and recommendation, the hearing examiner succinctly summarizes DeCrescentis's testimony:

* * * He insisted, however, that there were differences in the two jobs: The CLO quality assurance specialist would "be monitoring to make sure that that person in the home was receiving the type of support services that would allow that person to live comfortably in that home." He distinguished this from the role of the case manager, who "would be responsible for also making sure that services that fell outside of that broker residential service were also being provided. If it was therapy as an example or if the person was gainfully employed in the community, to make sure that that person was safe while working in that employment situation." If in the residential setting there was an allegation that an adult was being abused or neglected, the quality assurance provider through CLO would not conduct that investigation: he or she would instead bring this to the attention of the case manager who would then begin the investigation. In this way, Mr. DeCrescentis said, the "responsibilities of the quality assurance coordinator was [sic] very narrowly defined. Case manager's responsibilities were far more expansive in terms of age. They were monitoring health and safety of infants, children, and adults. Quality

assurance was only monitoring adults that were receiving a specific service that they brokered." In his view, "the only common denominator would be that they were both focused on adults and they both focused on the individual plan that was developed on behalf of that adult to make sure that services were being rendered."

Mr. DeCrescentis examined the position descriptions for Lucas County's case manager (shown as Claimant's Exhibit No. 9) and CLO's position description for the Quality Assurance Coordinator (Claimant's Exhibit No. 11), and agreed these applied to the positions held by Anita Allen first while she was with Lucas County, and then with CLO. In this way, Mr. DeCrescentis was able to identify areas where the two positions were similar:

• Both positions required Ms. Allen to "ensure[ ] the involvement of multiple agencies regarding the timely and type of services rendered;"

• Both positions required Ms. Allen to "link[ ] eligible individuals with specific services."

Mr. DeCrescentis said a quality assurance person at CLO could not, however, "assist an adult in finding placement to protect his or her well-being from harm" in a crisis situation. According to Mr. DeCrescentis, while a CLO quality assurance person could "monitor and track unusual incidents in supporting living and follow up as appropriate," a case manager could "investigate[ ] and report[ ] major unusual incidents involving alleged abuse and/or neglect." The difference here, according to Mr. DeCrescentis, is that in "major unusual incidents," the individual is "immediately at risk of harm," where, for example, the person is not getting his or her medication in a timely manner. An "unusual incident," on the other hand, might be something like finding that "the person had not eaten that day or there was insufficient food in the cupboard" but "the person's well-being was not at risk at that moment in time." He said Lucas County "never transferred case management responsibilities to CLO."

Mr. DeCrescentis agreed that there are "overlaps" in the duties assigned to case managers and quality assurance coordinators, and "monitoring the individual plan" would be one example of such an overlap. He said it wouldn't surprise him to find out that CLO employees would discover serious incidents of abuse, but it would be their responsibility "to bring it to the attention of the individual's case manager, because it's the case manager's responsibility to conduct the investigation." * * *

{¶ 56} As earlier noted, Lori Stanfa, former executive director of CLO, testified on behalf of relator before the hearing examiner. In his report and recommendation, the hearing examiner succinctly summarizes Stanfa's testimony:

\* \* \* She was familiar with the positions of case manager (for the County Board) and both the quality assurance specialist and the quality assurance coordinator. In taking issue with the PERS senior staff determination that the case manager position was substantially similar to the quality assurance specialist, Ms. Stanfa said the case management functions did not include "supported living" functions: "supported living was brand new and was different than the group home provider system and had some additional requirements which included a quality assurance function that had not previously been performed by case managers." She said by administrative rule, once supported living came into being, "there was a very specific protocol to be done for quality assurance and supported living" that did not exist for case management. She said that case managers did do monitoring, but "it was different than what this rule required in quality assurance."

Ms. Stanfa did not recall with certainty, but she said her recollection was that Ms. Allen started as a quality assurance specialist and was thereafter promoted to quality assurance coordinator at CLO. She explained that at the beginning of her service as executive director at CLO, Lucas County case managers worked with supported living providers at the beginning of CLO, and that case managers "were developing the service plans" but they were not "doing the quality assurance" part, referred to in the position description for the quality assurance coordinator.

\* \* \*

When asked if Ms. Allen's duties as a quality assurance specialist at CLO were the same as when she was a case manager at Lucas County, Ms. Stanfa said "I would not say they were the same, because we developed supported living based on \* \* \* a set of regulations and rules that were new and were not functions previously performed by the Board." To emphasize this point, Ms. Stanfa looked at the contract between Lucas County and CLO, where it called for CLO to develop, negotiate, monitor and audit supported living contracts, which were functions that Lucas County would not have performed-because these were the functions CLO was set up to perform. She also provided, in her written affidavit, a statement that described the differences between the claimants' positions when they were at Lucas County and when they worked at CLO: "The Quality Assurance Coordinator position was responsible for developing supported living plans and conducting quality assurance reviews to determine the quality of services and level of community integration provided to persons with developmental disabilities in supported living arrangements, a responsibility not previously performed by Lucas County."

Ms. Stanfa allowed that some of the duties performed by case managers were also performed by CLO quality assurance specialists. She agreed that in the

block that reads 35 percent "implements and maintains a variety of records, reports, correspondence, and other communications," and "attends staffings, meetings, and conferences," this described something "we all probably do." Like Mr. DeCrescentis, Ms. Stanfa said both would work with providers and State MRDD staff, but when CLO looked to link eligible individuals with service providers, it would use requests for proposals, which is different than the way Lucas County had performed the same linking. She explained that the use of RFPs "was a completely new way of doing business" and that it allowed CLO participants to choose their providers: "When we developed CLO, we set it up that that would be the way that people would choose providers. We would do these RFPs and the consumers would then interview the providers. Compared to the way things had always been done, * * * we would actually interview the consumers to see whether or not they wanted to serve them. So it was kind of a shift in the way we did business. And that was really, I think, the difference between supported living and the old model." She also agreed that both the CLO quality assurance staff and Lucas County case managers would be involved in the review of individualized service plans (ISPs), but it wasn't a function of CLO quality assurance staff to actually place people in facilities; instead she said "we would help find places."

When asked whether quality assurance staff would investigate or report major unusual incidents involving allegations of abuse or neglect, Ms. Stanfa said "I don't recall that being a function of QA." When asked about whether the case mangers at Lucas County served the same clientele as CLO, Ms. Stanfa said at the beginning, yes: "the case managers were assigned to assist us in developing plans for the supported living clients, initially. They did that for some period of time until we took over that function later." At the beginning, "there was some overlap for a period. But we ended up taking all those functions over completely." She also agreed that one of the ways CLO quality assurance staff monitored individuals was through the IEP or ISP review process, and while the same was true of Lucas County case workers, "the distinction would be that they were responsible to do that for folks who were served in the supported living program, not for other people."

{¶ 57} Obviously, the jobs performed by claimants at CLO were not identical to the jobs they held at Lucas County MRDD. Relator endeavored at great length to point out the differences. However, in the magistrate's view, the hearing examiner appropriately analyzed the conflicting evidence before him. To the hearing examiner, resolution of the matter turned on what he viewed as the "core function" of the jobs performed at Lucas County MRDD and the jobs performed at CLO. The hearing examiner explained:

Taken as a whole, the evidence now before the Board establishes that when Lucas County created CLO, it did so intending that the governmental functions it had been providing would be outsourced to the new non-profit corporation. The duties, to be sure, changed in response to the mandate found in HB 257: the scope of the duties expanded, to allow CLO to serve as a broker to supported living facilities as well as residential living licensees. The county's case managers and habilitation coordinators who became CLO quality assurance specialists and coordinators continued, however, to perform the core function of providing housing and habilitation resources to persons with mental retardation and developmental disabilities. The determination by PERS senior staff, that the positions were "similar in their purpose to assess needs and coordinate services for individuals who have mental retardation or other developmental disabilities" has been confirmed by the evidence now before the Board. As such, the staff determination that these employees "were primarily performing similar duties with each employer" has been supported by at least a preponderance of the evidence, warranting a recommendation that the Board affirm the senior staff determination and deny the appeal of Lucas County.

{¶ 58} Accordingly, based upon the above analysis, this magistrate concludes that relator's challenge to OPERB's decision lacks merit.

{¶ 59} One further matter deserves attention. Relator seizes upon the hearing examiner's statement that relator outsourced work to CLO that had been performed by county employees. According to relator, "you cannot outsource a job that you continue to fill." According to relator, because there is no evidence in the record that relator eliminated the jobs held by claimants when they resigned their positions to take positions at CLO, the hearing examiner improperly concluded that relator had outsourced jobs to CLO.

{¶ 60} Relator offers no dictionary definition of the word "outsource." However the word might be defined, whether or not relator refilled the jobs vacated by claimants is immaterial to the analysis under R.C. 145.01(A)(2). In short, whether the hearing examiner appropriately used the word "outsource" is not truly an issue to be resolved by this court.

{¶ 61} Accordingly, for all the above reasons, it is the magistrate's decision that this court deny relator's request for a writ of mandamus.